(C.D. 3883)

B. A. McKENZIE & Co., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided September 11, 1969)

*Glad & Tuttle* (*George R. Tuttle* of counsel) for 'the plaintiff.
*William D. Ruckelshaus*, Assistant Attorney General (*Sheila N. Ziff* and *Velta A. Melnbrencis*, trial attorneys), for the defendant.

Before Rao, Ford, and Newman, Judges

Rao, Chief Judge: The merchandise involved in this case, imported from Mexico, is described on the invoices as "Ixtle Fibre Pads" and was assessed with duty at 20 per centum ad valorem under item 355.05 of the Tariff Schedules of the United States as webs, wadding, batting, or nonwoven fabrics, or articles made therefrom, of vegetable fibers. Various claims have been made in the protest and amendments thereto, but those presently relied on are that the merchandise is properly dutiable at 10 per centum ad valorem (1) under item 222.64 of said tariff schedules, as articles not specially provided for of unspun fibrous vegetable materials, other, or (2) under item 192.85, as straw or other fibrous vegetable substances, processed, or (3) under item 799.00, as an article not provided for elsewhere in the tariff schedules.

The pertinent provisions of said tariff schedules are as follows:
Tariff Schedules of the United States:

## Schedule 3

Schedule 3 headnotes:

1.  This schedule does not cover—
    (i)  articles of unspun fibrous vegetable materials (see part 2B
of schedule 2);

    \*        \*        \*        \*        \*        \*        \*

2.  For the purposes of the tariff schedules—
    (a)  the term "textile materials" means—
        (i)  the fibers (cotton, other vegetable fibers, wool and hair
             silk, and man-made fibers) provided for in part 1 of this
             schedule,

    \*        \*        \*        \*        \*        \*        \*

### Part 1—Subpart B.—Vegetable Fibers, Except Cotton

Subpart B headnote:

1.  For the purposes of the tariff schedules—
    (a)  the term "vegetable fiber" means vegetable fiber which
         can be spun and includes fiber chiefly used for padding
         and stuffing (such as kapok and crin vegetal) \* \* \*.

Classified under:

### Part 4—Subpart C.  —Wadding, Felts, and Articles Thereof \* \* Other special Fabrics

Subpart C headnotes:

    \*        \*        \*        \*        \*        \*        \*

2.  For the purposes of the tariff schedules—

    \*        \*        \*        \*        \*        \*        \*

    (b)  the term "nonwoven fabrics" refers to fabrics made
of matted textile fibers which are not in the form of yarns, \* \* \*

    \*        \*        \*        \*        \*        \*        \*

       Webs, wadding, batting, and nonwoven fab-
rics, including felts and bonded fabrics, and
articles not specially provided for of any one
or combination of these products, all the
foregoing, of textile materials, whether or
not coated or filled:

355.05        Of vegetable fibers_____  20% ad val

Claimed under:

## Schedule 1

### Part 15 — Subpart G. — Miscellaneous Vegetable Products

    \*        \*        \*        \*        \*        \*        \*

Straws and other fibrous vegetable substances not specially provided for, crude or processed:

\* \* \* \* \* \* \*

Other:

\* \* \* \* \* \* \*

192.85      Processed _____ 10% ad val

Schedule 2

Part 2 - Subpart B. - Bamboo, Rattan, Willow, and Chip; Basketwork, Wickerwork, and Related Products of Fibrous Vegetable Substances

Subpart B headnotes:

1. This subpart does not cover—
   (i) webs, wadding, batting, and nonwoven fabrics, and articles thereof (see part 4C of schedule 3);

\* \* \* \* \* \* \*

2. For the purposes of the tariff schedules—

\* \* \* \* \* \* \*

   (d) the term "unspun fibrous vegetable materials" means bamboo, rattan, willow, chip, straw, palm leaf, grass, seagrass, and similar fibrous vegetable substances, which have not been spun.

\* \* \* \* \* \* \*

Articles not specially provided for, of unspun fibrous vegetable materials:

\* \* \* \* \* \* \*

222.64      Other_____ 10% ad val.

Schedule 7

Part 14. Nonenumerated Products

Any article, not provided for elsewhere in these schedules:

\* \* \* \* \* \* \*

799.00      Other_____ 10% ad val.

At the trial, plaintiff called Joseph L. Carman III, president and general manager of Carman Manufacturing Company, the importer herein. He testified that his firm manufactures mattresses and box springs; that he is in charge of the general management of the company and supervises the manufacture of the products. He was familiar with the merchandise involved herein and identified two representative samples, received in evidence as exhibit 1. They consist of large

pads of fibers in an unwoven condition, massed and apparently pressed together. Mr. Carman testified that they are ordered as sisal pads for mattress use in specific sizes for twin, double, queen, or king size mattresses. They are used in inner spring mattresses to cover the metal springs and insulate the cotton felt upholstery from the spring unit itself. A small mattress was received in evidence as exhibit 2 to illustrate the use of the pad. Mr. Carman stated that the pad is placed over and fastened to the spring unit and that the cotton felt upholstery material goes over it. The mattress is finished by tufting or quilting. Sometimes the sisal is stitched to the cotton with a quilting machine. The witness had never seen such pads used for anything else except in furniture where it is also used for spring insulation.

Plaintiff's second witness was Robert C. Blanchard, sales supervisor of Tubbs Great Western Cordage Company. He has been with that firm for 24 years and has previously served as cost accountant, general manager, sales manager, and assistant manager. He testified that the business of the firm is the manufacture of hard fiber cordage, that is, manila and sisal rope and twine, and that he is familiar with the raw materials used in the course of production, and with the process of manufacture. He had bought sisal and henequen for the company, different types being purchased for different types of jobs. Henequen is acquired from Mexico and is known as agave henequen, or agave fourcroydes. Sisal (agave sisalina) is purchased from Africa, Java, South America, Indonesia, and all over the world and is a better product than henequen. African sisals are used to make a good grade of rope or twine but henequen is blended in to cut costs.

Sisal is graded on the basis of cleanliness. The cleaner the fiber the more even are the sizes of the individual fibers. Henequen runs from 30 to 36 inches long and African sisal up to 48 inches. Thirty inches is the minimum length that can be used in the cordage industry.

Sisal and henequen are received at the Tubbs plant in individual hanks of fiber, that is, fibers which have been combed slightly and are loosely tied and packed together. The merchandise is run through machines called breakers in seven different combing operations to get the fibers as nearly parallel as possible and to comb and stretch them to a finer degree. Then they are spun and the strands are formed into rope.

The witness examined exhibit 1 and said that he believed it was a form of sisal or henequen, although he had never purchased those materials in that condition. In his opinion, exhibit 1 could not be combed or spun. He explained that if it were put through breakers the material would be torn to bits and there would be no long fibers only a series of short, broken fibers.

Mr. Blanchard testified that there were probably 10 different types of henequen fiber in exhibit 1 and that they were of a very low grade. They would not be useful to the cordage industry in matted condition as found in the pads. His firm had used some fibers of the type contained therein but not in that length. A few fibers were drawn from exhibit 1 and marked exhibit 3. The witness testified that so far as diameter and strength were concerned, they were of a type useful to his industry, but not as to length. He said that another piece drawn from exhibit 1 would not have any use because it consisted of stems and pieces and could not be combed.

Plaintiff's third witness was Charles F. Quibell, a graduate student and research assistant at the University of California, Botany Department. He holds a B.A. degree in botany from Pomona College and previously served in the Army as a lieutenant attached to the Chemical Corps where he was involved in the analysis of plants used as test subjects in the defoliation program. He has also been a teaching assistant and has been responsible for teaching laboratory sections including a course in plant anatomy.

The witness is presently engaged in identifying plants and processing them for insertion in the plant collection in the university herbarium. He made comparisons according to the gross morphological aspects of the plant which he said includes the structure of flowers and fruits, the size of the various components, and in some cases the internal anatomy of the plant. He also compares specimens by means of microscopic examination.

Mr. Quibell testified that there are two major groups of flowering plants—the monocotyledons and the dicotyledons. Hard fibers come from the monocotyledon group and soft fibers from the dicotyledons. He said that there are probably 100,000 species of monocotyledonous plants, but that the structure of the vascular tissue is essentially the same for the whole group. The differences are in other characteristics, such as shape of the plant, thickness of the leaves, and proportion of the fiber to the vascular strands.

The witness had been given a small specimen which had been removed from exhibit 1 and had used a portion in making an analysis. The remainder was received in evidence as exhibit 5. He stated that he had prepared and mounted pieces of the fiber on a glass slide and had also prepared slides having a portion of an agave leaf and a portion of a palm leaf. He made comparisons of the transverse sections of these fibers and found the fibers of exhibit 5 were similar in morphology (vegetative structure) to those of the agave leaf and to a lesser degree to those of the palm leaf. He explained that the fibers consisted of fibro-vascular bundles, meaning a combination of the vascular tissues

with the fiber cells. He said that a fibro-vascular bundle has a character-istic pattern in transverse section, depending upon the group of plants it comes from, and that the pattern of exhibit 5 resembled very closely that of the agave leaf. On the basis of his examination, he identified the material in exhibit 5 as fibro-vascular bundles from monocoty-ledonous plants. He described it as a matting or assemblage of hard fibers, very largely from agave or yucca type plants. He declined to name the exact species of the plant, pointing out that there were proba-bly a hundred species of agave, of which henequen was one. He said, however, that as far as the structure is concerned, the differences are minor.

Mr. Quibell further testified that the term "fibrous vegetable sub-stances" in a botanical sense means any plant which has a cellular composition made up of fiber. He included such items as a pine tree, a rhododendron bush, hemp, kapok, and cotton.

The witness stated that insofar as the monocotyledonous fibrous structure is concerned, exhibit 5 is a fibrous vegetable substance simi-lar to bamboo, rattan, straw, palm leaf, and some grasses. He said that abaca, coir, and crin vegetal also had a similar vascular structure, but that willow and chip were somewhat distinctive and not similar.

Plaintiff claims that the imported pads are classifiable as unspun fibrous vegetable materials on the ground that the fibers have not been spun and are similar to bamboo, rattan, straw, palm leaf, grass and sea grass. Defendant contends, however, that the pads correspond to defi-nitions of the terms wadding, batting, or nonwoven fabrics, and that to be classifiable under item 355.05 merchandise need not consist of fibers that have been spun.

The record establishes that the imported pads are composed of hard fibers which have not been spun. There is also evidence indicating that the fibers are derived from the henequen, agave or yucca plants, all of which belong to the monocotyledonous group of flowering plants, have certain characteristics in common, and are similar in morphology. According to Mr. Quibell, bamboo, rattan, straw, palm leaf and some grasses have a similar monocotyledonous fibrous structure.

Plaintiff argues in effect that since the material here is similar in botanical structure to bamboo, rattan, straw, palm leaf and grass, it is to be classified as an article composed of unspun fibrous vegetable materials rather than as an article composed of wadding, batting or unwoven fabrics of vegetable fiber.

No doubt the material in these pads is a fibrous vegetable substance in the broad sense of the term used by Mr. Quibell. That, however, is not the sense in which the term has been used in tariff statutes. *Reed & Keller* v. *United States*, 5 Ct. Cust. Appls. 95, T.D. 34133 (1914).

The appropriate question here is whether the fibers in the imported pads are fibrous vegetable substances similar to bamboo, rattan, willow, chip, straw, palm leaf, grass or sea grass, within the meaning of the Tariff Schedules of the United States. The only evidence of similarity presented by the record is in botanical structure. How and to what extent these fibers differ or resemble the named materials in other respects has not been established. Since tariff acts are not written in terms of botany but of commerce, we do not deem similarities in botanical structure alone as conclusive. *Nylos Trading Company* v. *United States*, 37 CCPA 71, C.A.D. 422 (1949) ; *Chester K. Stoner* v. *United States*, 42 Cust. Ct. 178, C.D. 2083 (1959). More indicative of congressional intent are the specific provisions in the subpart covering bamboo, rattan and other fibrous vegetable substances (schedule 2, part 2B). The material and articles named include woven or partly assembled material of bamboo, rattan, willow, chip, raffia, and other unspun fibrous vegetable materials, suitable for use in making blinds, shutters, curtains, screens or shades; baskets and bags of bamboo, willow, rattan, palm leaf and other unspun fibrous vegetable materials; blinds, shutters, curtains, screens and shades of unspun fibrous vegetable materials; and floor coverings of straw and other unspun fibrous vegetable materials. It is readily apparent that the term "similar fibrous vegetable substances" refers to materials such as those named, suitable for use for basketry, wickerwork, blinds, shades, flooring and related products, rather than to materials which are similar in botanical structure.

In *Plant Products Corporation* v. *United States*, 44 CCPA 183, C.A.D. 658 (1957), relied on by plaintiff, the court pointed out that the degree of likeness required to constitute similarity must be based on consideration of the particular circumstances involved. The Parathion before the court was derived from one of the coal-tar products provided for *eo nomine,* had a similar chemical structure, and possessed insecticidal properties which many of the enumerated products had. Cf. *BASF Colors & Chemicals, Inc.* v. *United States*, 56 CCPA 47, C.A.D. 952 (1969), where it was held that dissimilarity in molecular structure was not sufficient to show that a particular chemical was not similar to enumerated coal-tar products for tariff purposes.

There are several provisions of the tariff schedules which must be taken into account in order to determine the proper classification of the instant pads. Item 355.05 covers webs, wadding, batting, unwoven fabrics, or articles thereof, of vegetable fiber. Vegetable fiber is defined in the textile schedule (schedule 3, part 1B, headnote 1) as vegetable fiber which can be spun, including fiber chiefly used for padding and

stuffing, such as kapok and crin vegetal. This indicates that for the purposes of the textile schedule, a vegetable fiber is one which is spinnable but not necessarily spun. This is also evident from the definition of unwoven fabrics in that schedule (part 4C, headnote 2(b)), which includes "matted textile fibers which are not in the form of yarns."

Since the collector classified the within merchandise under item 355.05, it is presumed that he found all the facts necessary to sustain that classification, including a finding that the merchandise was composed of vegetable fiber, as that term is used in the textile schedule. The evidence presented does not controvert that finding. The testimony of Mr. Blanchard is to the effect that the fibers in the imported pads would not be useful in the cordage industry in their imported condition and could not, or would not, be spun commercially. However, it appears that they belong to a class of fibers which his firm does use. He said that if the fibers in the pads had been longer and not in a matted condition, they would have been useful for making cord or twine. Thus, they are of a type which is spinnable for cordage purposes at least. In view of the definition of unwoven fabrics in part 4C, *supra*, as matted textiles, we do not believe it was intended that the fibers in such fabrics be in spinnable condition in their imported condition.

It is significant of congressional intent that sisal and henequen are included in the textile schedule (schedule 3, part 1B) under provisions for vegetable fibers, and not under schedule 2, part 2B, which includes fibrous vegetable substances. Evidently Congress considered them a kind of spinnable vegetable fiber.

It is apparent from the following statement in the Tariff Classification Study (schedule 2, page 50) that it was not intended that pads of wadding composed of unspun vegetable fibers be classified as articles of unspun fibrous vegetable substances:

> It should be noted, however, that one important class of textile products made from unspun vegetable fibers would not be included in this subpart or in any tariff provision elsewhere relating to articles specifically described as being of "unspun fibrous vegetable materials." These textile products are the webs, wadding, padding, and nonwoven fabrics and articles thereof provided for in the textiles schedule (see particularly part 4C of schedule 3). Such nonwoven articles in the textiles schedule would be comprised *essentially of spinnable vegetable fibers in matted form* whereas the products made of "unspun fibrous vegetable materials" would be interlaced or woven or otherwise assembled in a more orderly manner. [Emphasis supplied.]

The pads here are composed essentially of henequen and sisal, which belong to a class of spinnable vegetable fibers. They are in matted form, are not interlaced or woven, and correspond to definitions of

"wad" and "wadding". See, for example, Webster's Third International Dictionary (1968 edition):

> wad * * * b: a soft mass (as of loose fibrous material) variously used (as to stop an aperture, pad a garment, or hold grease around an axle) * * *
> wadding * * * b: a soft mass or sheet of short loose fibers used for stuffing or padding (as quilts, costumes, upholstery, or packages) * * *

From the foregoing, we conclude that it was the intent of Congress that articles, such as the pads involved herein, be classified under item 355.05, wadding, batting, or unwoven fabrics, or articles made therefrom of vegetable fibers, and not under item 222.64, as articles of unspun fibrous vegetable materials.

Plaintiff's other claims are untenable. Since the imported merchandise has been made into articles of vegetable fiber, it is more than processed fibrous vegetable substances and cannot be classified under item 192.85. The merchandise is enumerated in the tariff schedules and so cannot be classified under item 799.00.

For the reasons stated, the protest is overruled. Judgment will be entered accordingly.