**CONVERTORS DIVISION OF AMERICAN HOSPITAL SUPPLY CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 81–5–00489.**

United States Court of International Trade.

Nov. 5, 1987.

---

Sharretts, Paley, Carter & Blauvelt, P.C. (Donald W. Paley and Allan H. Kamnitz, New York City, of counsel), for plaintiff.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Civ. Div., Dept. of Justice, and Susan Handler–Menahem, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

NEWMAN, Senior Judge:

### Introduction

Defendant has moved and plaintiff has cross-moved for summary judgment pursuant to USCIT Rule 56. These cross-motions raise the issue of the proper tariff classification for certain headwear, alleged by plaintiff to be disposable nurses' caps, imported into the United States through the port of El Paso, Texas between July 1972 and July 1979. The merchandise was classified by Customs under the provision in item 703.15, Tariff Schedules of the United States (TSUS), for Headwear, of man-made fibers, not knit, and assessed with duty at the rate of 25 cents per pound plus 20 per centum ad valorem. Plaintiff claims that the merchandise is properly dutiable under the provision in item 703.75, TSUS, for "Other headwear" at the rate of 8.5 per centum ad valorem.

For the reasons indicated below, defendant's motion for summary judgment is granted.

### The Record

In support of its motion for summary judgment, defendant has submitted:

*Exhibit A:* Copies of plaintiff's advertising materials for its disposable caps, which describe the caps' material as "fabric" and never as "paper."

*Exhibit B:* Copy of Kirk & Othmer, *Encyclopedia of Chemical Technology* (3rd Edition, 1981), Volume 16, pp. 104–109, which describes the characteristics of non-woven textile fabrics and such fabrics made of woodpulp combined with various man-made fibers.

*Exhibit C:* Copy of *Pulp & Paper, Chemistry & Chemical Technology* (2nd Ed.), Vol. 1, Chapter IV, pp. 100–105, concerning pulping.

*Affidavit (with attachments) by Richard J. Eyskens,* National Import Specialist for the United States Customs Service, whose duties include the classification of headwear and other wearing apparel, stating *inter alia* that hospital disposable headwear is made from a nonwoven textile fabric and not from paper; and that nonwoven disposable headwear is usually made by a wet laid process and is web formed.

*Affidavit by Alan Horowitz,* National Import Specialist for the United States Customs Service, whose duties include the classification of machines for making paper under item 668.00, TSUS, and machines for making nonwoven fabrics under item 670.-35, TSUS. Mr. Horowitz avers that the Rotoformer manufactured by the Sandy Hill Corporation is capable of producing a variety of materials, including nonwoven textile material and paper. Attached to the Horowitz affidavit are Sandy Hill promotional publications relating to the use of the Rotoformer for producing nonwoven fabrics by the wet laid system. In none of these publications is the Rotoformer described or referred to as a paper-making machine.

*Affidavit by John E. Barnette,* a Textile Technologist for the United States Customs Service, concerning the composition and range of fiber length for the fibers used in certain style numbers for plaintiff's disposable headwear tested in November and December of 1979.

In support of its cross-motion for summary judgment, plaintiff has submitted:

*Exhibit 1:* An affidavit by Ambrose L. Kellen, Vice–President of manufacturing of the Convertors Division of American Hospital Supply Corporation during the period of January 1975 to March 1980, concerning

the materials comprising the nonwoven web produced to plaintiff's specifications by the Chicopee Manufacturing Company used to produce the imported headwear. Attached to the Kellen affidavit is a sample of the imported nurses' caps.

*Exhibit 2:* An affidavit by William J. Rose, manager of Chicopee's wet forming plant in North Little Rock, Arkansas between 1970 and 1979, describing the nonwoven web material used in the imported headwear. Attached to Rose's affidavit is a Sandy Hill catalog describing the Rotoformer, a sheet forming machine used to produce the web material, and a sample of the polyester fiber used in the subject headwear.

*Exhibit 3:* An affidavit by Trevor A. Finnie, Senior Vice–President of Werner Management Consultants, Inc., a consultant to the textile and apparel industries, concerning the unsuitability of 1.5 denier, ¼ inch cut, polyester in the production of textile fabrics. Attached to Finnie's affidavit is a sample of crimped polyester.

*Exhibit 4:* An affidavit by George J. Ganiaris, adjunct professor in the Textile Science Department of the Fashion Institute of Technology, concerning the non-use of uncrimped, ¼ inch, 1.5 denier polyester in textile applications.

*Exhibit 5:* A Customs Service ruling (C.S.D. 79–348) dated February 1, 1979 determining that certain disposable headwear made on a paper-making machine is classifiable under item 703.75, TSUS, without regard to which ingredient of the material was its chief value.

*Exhibit 6:* A Customs Service ruling (ORR Ruling 72–0134) dated March 16, 1972 concerning the classification of Verti–Forma paper-making machines.

*Exhibit 7:* A publication of the Albany Felt Company, "Paper Machine Felts," describing certain machines used in manufacturing paper, including the Sandy Hill Corp. Rotoformer.

### Facts

The merchandise involved in this classification dispute consists of disposable headwear produced from a nonwoven material, textile thread, and for some styles, rubber elastic. The nonwoven material was purchased by plaintiff from the Chicopee Manufacturing Company of North Little Rock, Arkansas, which produced the material to plaintiff's specifications. It appears that the material produced by Chicopee was cut by plaintiff's El Paso, Texas plant and then exported to Mexico for assembly with thread and elastic into the subject headwear.

At Chicopee, the nonwoven material was produced by creating a "web" utilizing a wet forming process. The web material was produced by combining woodpulp, short length, uncrimped and untwisted polyester fibers, resin binders, and fire retardants. The polyester was used in the web material to reinforce it and reduce the stiffness that would otherwise result from an all woodpulp web. There is no dispute that the polyester is the most costly material in the headwear.

At Chicopee, the woodpulp and polyester fibers were blended and the blended slurry was then processed by the Rotoformer, a sheet forming device, to create the nonwoven material of which the headwear is composed. Finally, the polyester used in the headwear is not twisted, crimped or curled and is not suitable for making yarns, for flocking or cordage, or for use in woven or knitted textile fabrics.

### Parties' Contentions

Plaintiff asserts that the classification of the headwear by Customs under item 773.-15 was improper since the polyester fibers used in the headwear are not "man-made fibers" within the tariff definition of that term in headnote 2(a), Schedule 3, Part 1, Subpart E. According to plaintiff, to fall within the tariff definition of the term "fibers" in headnote 3(f) of Subpart E, the polyester must be suitable for the manufacture of textiles. Thus, argues plaintiff, the polyester in the headwear is not suitable for the manufacture of textiles and consequently cannot constitute man-made fibers for tariff classification purposes.

Alternatively, plaintiff urges that even if the polyester fibers are man-made fibers, the polyester is not a "component material" of the headwear, but rather an ingredient of the web material, which assertedly is paper. Accordingly, plaintiff maintains that the headwear is in chief value of paper and therefore is properly dutiable under item 773.75, TSUS.

Defendant, on the other hand, insists that the polyester fibers are man-made fibers as defined in headnote 2(a), whether or not the polyester is suitable for the manufacture of textiles. Further, defendant urges that in any event, the polyester fibers are suitable for the manufacture of textiles, *i.e.*, nonwoven textile fabric, since the web material is a nonwoven textile fabric and not paper. Finally, defendant posits that whether the web material is nonwoven fabric or paper, the component material of chief value of the headwear remains man-made fibers (*viz.*, polyester), the headwear's most costly component material.

The court agrees with defendant's contentions.

### Opinion

Fundamentally, under rule 56 of the Rules of the Court of International Trade a motion for summary judgment can be granted only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. The court has determined that there is no genuine issue as to any material fact, and that the legal issues presented in this case are ripe for determination on the cross-motions for summary judgment.

The primary task before the court is to determine the intent of Congress in defining *"Man-made fibers"* in headnote 2(a) of Schedule 3, Part 1, Subpart E, and in defining the term *"fibers"* in headnote 3(f) of Subpart E. Secondarily, if the court should conclude that the polyester fibers in the headwear are man-made fibers as defined

in headnote 2(a), the court must then in conformance with General Headnotes 9(f)(i) and 10(f) address the legal issue of whether the headwear is in chief value of man-made fibers.[1]

### I.

■ There is no dispute between the parties that the polyester in the headwear is man-made. Nevertheless, plaintiff contends that the government's classification of the headwear under item 703.15, TSUS, is erroneous because the particular polyester fibers used in its headwear do not fall within the tariff definition of "man-made fibers." *See* headnote 2(a) of Schedule 3, Part 1, Subpart E. In that regard, plaintiff argues that the polyester does not meet the tariff definition of man-made fibers since, as defendant concedes, it is not capable of being used to create a textile yarn, braid, cordage or flock. To support its restrictive interpretation, plaintiff points to headnote 3(f), which reads:

(f) the term *"fibers"* includes filaments and strips, as defined above, in noncontinuous form, *and any other fibrous structure suitable for the manufacture of textiles;* [Emphasis added in part.]

Plaintiff maintains that the polyester in the headwear is not suitable for the manufacture of textiles and hence cannot be regarded for tariff purposes as "fibers."

Defendant, on the other hand, argues that irrespective of whether the polyester is suitable for the manufacture of textiles, the polyester meets the definition of man-made fibers in headnote 2(a) of Schedule 3, Part 1, Subpart E, which reads:

2. (a) For the purposes of the tariff schedule, the term *"man-made fibers"* refers to the filaments, strips, and fibers covered in this subpart.

From the court's reading of headnote 3(f), the term "fibers" includes filaments and strips (which in turn are defined above in headnotes 3(a) to 3(e)) and *in addition*

---

**1.** In the TSUS, the term "of" means that the article is wholly or in chief value of the named material. An article is in chief value of a material if such material exceeds in value each other

single component material of the article. General Headnotes and Rules of Interpretation, Rules 9(f)(i) and 10(f).

any other fibrous structures suitable for the manufacture of textiles. As the court construes headnote 3(f), it is only the "other fibrous structures" portion of the definition of fibers that is subject to the qualifying use language: "suitable for the manufacture of textiles." The Explanatory and Background Materials to the *Tariff Classification Study*, Schedule 3 (Nov. 15, 1960), page 48, clearly demonstrate that the language in headnote 3(f), "any other fibrous structure suitable for the manufacture of textiles" was intended to extend or broaden the scope of the term "fibers" rather than to restrict the definitions pertaining to "filaments" and "strips." [2]

Defendant aptly points out, too, that under headnote 3(f) the term fibers "includes filaments and strips, *as defined above*" (emphasis added), and that the definitions pertaining to filaments and strips set forth above in headnotes 3(a) to 3(e) are in no way expressly limited by their suitability for the manufacture of textiles except for plexiform filaments as defined in headnote 3(c). Hence, it is apparent that when the drafters of the tariff schedules intended to impose a qualification of suitability for textile manufacture on the headnote definitions, they expressed that intent in the language of the headnote. The foregoing observation is further pointed up by the language of headnote 2(c), which provides that "[f]or the purposes of the provisions of the tariff schedules applicable to articles of man-made fibers, *glass* filaments and *glass* fibers shall be treated as man-made fibers *only if they have been made into yarns or cordage, or if they are present in fabrics or other articles in the form of yarns or cordage*" (emphasis added). Thus, the language of headnote 2(c) demonstrates that when the drafters of the schedules intended to impose the use qualification urged by plaintiff, such intent was expressed.

The court, therefore, agrees with defendant's contention that irrespective of whether the polyester used in plaintiff's headwear is suitable for the manufacture of textiles, the polyester is embraced by the term "man-made fibers" in headnote 2(a) and in item 703.15, TSUS.

## II.

■ Even assuming *arguendo* that the polyester in the imported headwear may fall within the definition of "man-made fibers" in headnote 2(a) only if it is suitable for the manufacture of textiles, the court finds that the web material in which the polyester was used is a nonwoven textile fabric, as claimed by defendant, rather than paper, as claimed by plaintiff.

Plaintiff contends, and it is undisputed, that the polyester in its headwear is incapable of being spun into yarn, braided, used for flocking, or used to make woven or knitted textile fabrics because the short length fibers are not crimped, twisted or curled. However, on the basis of the undisputed facts, the court finds that the Chicopee web material is a "nonwoven fabric."

In the TSUS, the term "nonwoven fabrics" is defined as "fabrics made of matted textile fibers which are not in the form of yarns." Headnote 2(b), Schedule 3, Part 4, Subpart C. The *Tariff Classification Study*, Fifth Supplemental Report (May 16, 1963), Schedule 3, page 17, discloses the vital distinction for tariff classification purposes between nonwoven fabrics and paper:

In addition to felts, the products involved in the aforementioned and related items include webs, waddings, battings and bonded fabrics. In bonded fabrics the fibers are bound together by processes other than felting. *These fabrics often closely resemble paper or paperboard but are distinguishable therefrom by the fact that the textile fibers are not digested in the process of manufacture.* Some papers and paperboards, however,

---

**2.** The *Tariff Classification Study* Explanatory Notes, Schedule 3, page 48, state: "Headnote 3(f) defines the terms *'fibers'* as including filaments and strips in noncontinuous form and 'any other fibrous structure suitable for the manufacture of textiles'. The quoted language is intended to prevent the exclusion from the man-made fiber concept of some now unknown form of fibrous structure which would be properly associated with man-made fibers."

do contain textile materials in the form of textile fibers, or of strands of such fibers, and even occasionally of small segments of yarns, which are included to impart a desired characteristic but without destroying the essential character of the product as a paper or paperboard. For example, silk filaments are used in paper currency to discourage counterfeiting, and textile materials are added for decorative effect in handmade art paper, etc. Such papers will, of course, be classified in Schedule 2. [Emphasis added.]

Plaintiff's contention that the polyester was "digested" in the process of producing the web material, even though no physical disintegration took place in the polyester fibers, is without merit. Indeed, the Sandy Hill descriptive brochure for the Rotoformer and other evidence before the court show indisputably that the Rotoformer used to manufacture the web material has no process of digestion. *See* affidavit and attached exhibits of Import Specialist Horowitz. Moreover, plaintiff's bland assertion that "the material at issue has been reduced to a homogeneous pulp with other fibers in the slurry" (brief at 18) is not substantiated by the Rose affidavit (plaintiff's exhibit 2); nor did Rose describe the pulp and polyester in the web as a "homogeneous mass."

Significantly, plaintiff's brochures used in marketing its headwear (defendant's exhibit A) consistently describe the material in the headwear as a "fabric" and never as "paper;" and significantly too, the Sandy Hill descriptive brochure for the Rotoformer represents that the machine is a "sheet forming device" and not a paper-making machine. A reading of the Sandy Hill brochure makes it abundantly clear that the Rotoformer is far more than simply a machine for making paper, and that the Rotoformer is strongly promoted for its use in making nonwoven fabrics. In point of fact, the Sandy Hill catalog, page 6, stresses the versatility of the Rotoformer's applications and specifically refers to nonwoven fabrics for hospital disposables:

One of the most intriguing applications for ROTOFORMERS has been in the development of nonwoven fabrics. Sandy Hill has pioneered in the development of machinery, such as the ROTOFORMER, for the production of nonwovens and many of the products now on the market were developed on Sandy Hill ROTOFORMERS. The machine is particularly suitable for such products because of its ability to produce sheets using fibers which cannot be formed on any other forming device.

To illustrate the potential in the field of nonwovens, surveys indicate that the market for *disposables in hospitals alone is $180,000,000, annually. The total market is estimated in the billions of dollars.* [Emphasis added.]

In furtherance of its argument that the Chicopee material is nonwoven textile fabric, defendant has submitted portions of several textile publications. Hence, in the publication, *Textiles: Fiber to Fabric* (5th Ed., 1975) (*see* exhibit 3 attached to the Eyeskens affidavit), with reference to formed (nonwoven) fabrics, the authors state:

"nonwovens are defined by the American Society for Testing Materials as fabrics constructed of fibers held together by bonding or the interlocking of fibers or both, accomplished by mechanical, chemical, thermal, or solvent means, and the combination thereof" (page 162);

the fibers used in nonwoven fabrics include polyester (page 162);

the wet-lay method based upon paper-making is used to produce nonwoven fabrics (page 163);

formed fabrics may have a wide range of characteristics including a paper-like appearance (page 167);

and formed fabrics are used for apparel such as caps (page 167).

In the publication, *Understanding Fabrics: From Fiber to Finished Cloth* (Fairchild Publications, 1982) (*see* exhibit 2 attached to the Eyeskens affidavit), the author describes "Nonwoven/Fused/Formed Fabric Structure" as "A fabric structure produced directly from fibers by a process of interlocking or bonding the fibers by any

one of the following seven processes: * * * 6. Wet Process." This publication also states: "Fibers used to produce nonwoven fabrics, alone or in combination, include * * * polyester" (page 85).

To buttress its argument that since the polyester fibers are incapable of being spun into yarn the web material is not a "nonwoven fabric," plaintiff cites *B.A. McKenzie & Co., Inc. v. United States*, 63 Cust.Ct. 110, C.D. 3883 (1969). However, plaintiff's reliance on *McKenzie* is misplaced, since that case involves *vegetable* fiber which is expressly defined in the textile schedule (Schedule 3, Part 1B, heatnote 1) as vegetable fiber which can be spun. As previously indicated herein, no such use qualification is applicable to the man-made polyester fiber in plaintiff's headwear.

In sum, on the undisputed facts before the court, the Chicopee web material is not paper as a matter of law, as claimed by plaintiff, but rather is a nonwoven textile fabric, as urged by defendant. Accordingly, the polyester fibers in plaintiff's headwear are suitable for the manufacture of textiles and are man-made fibers within the purview of item 703.15.

### III.

■ The court turns to defendant's contention that whether or not the web material is paper, the headwear is in chief value of polyester (which is without dispute the most costly material in the subject headwear), and therefore the imports were properly classified by Customs under item 703.15, TSUS.

Plaintiff's position is that if the web material is paper, the headwear is in chief value of paper and thus properly classifiable under item 703.75 as "Other headwear." Further, according to plaintiff, the

polyester is merely an ingredient of the paper rather than a component material of the headwear. To support its contention, plaintiff relies upon certain observations in *Swiss Manufacturers Association, Inc. v. United States*, 39 Cust.Ct. 227, C.D. 1933 (1957), wherein the court stated that "in making an article or manufacture dutiable according to its component material of chief value, Congress may name a material which is itself a manufacture * * *." 39 Cust.Ct. at 235.

But as stressed by the *Swiss Manufacturers* court, and conceded by plaintiff, the above-quoted approach to determining the component material of chief value represents a limited exception to the general method of determining the component material of chief value by comparing the costs of the primary materials or substances comprising the finished article, rather than the costs of manufactured components. Defendant insists that the special rule mentioned in *Swiss Manufacturers* is inapplicable here since, in classifying headwear in Schedule 7, Part 1, Subpart B according to its component material of chief value, Congress did not specifically name paper as a material.[3]

The court agrees with defendant and holds that the usual rule "that the component materials of an article or manufacture are the primary things or substances of which it is made" (*Swiss Manufacturers*, 39 Cust.Ct. at 235) is controlling here.

In *Kaplan Products and Textiles, Inc. v. United States*, 51 CCPA 2, C.A.D. 828 (1963), satin brocade cloth, classified as in chief value of rayon, was produced by bonding cellophane to aluminum foil, which was then cut into narrow strips and then woven with rayon yarn. The aluminum-cellophane strip material was more costly than the rayon yarn. The court held that

---

**3.** In Schedule 7, Part 1, Subpart B, headwear is classifiable in accordance with its component material of chief value pursuant to General Headnotes 9(f)(i) and 10(f). Inasmuch as paper is not one of the named materials in Subpart B, it appears that, by implication, headwear in chief value of paper is properly classifiable under the residual provision in item 703.75 for "Other headwear." However, in the instant case where the headwear is in chief value of man-

made fibers (whether or not the web material is paper), the headwear is obviously more specifically classifiable under item 703.15 than under the residual item 703.75. While there is no specific provision for headwear of paper in Subpart B, the court has noted that presently item 702.15 covers caps of paper *yarn*, which provision is plainly inapplicable to the subject nonwoven headwear.

in order to establish the cloth was not in chief value of rayon, plaintiff had the burden of proving the relative values of the *individual* component materials, *i.e.,* rayon, aluminum and cellophane.

*See also Wheeler & Miller v. United States,* 54 Cust.Ct. 137, C.D. 2521 (1965) ("[e]xcept where the statute contemplates that a mixture may be a component material of chief value * * * and except for chemical combinations and mixtures * * * the materials must be single materials: Two or more different materials cannot be preassembled together to make a combined material for value comparison purposes" (citations omitted).)

Following the above-cited decisions, the court concludes that whether or not the web material is paper, the fact that the headwear is in chief value of man-made fibers required classification of the imports by Customs under item 775.15, TSUS.

### Conclusion

Plainly, this case falls squarely within the spirit of the salutary procedural remedy of summary judgment, designed to obviate unnecessary trials where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Here, on the undisputed facts and legal issues presented, defendant is entitled to summary judgment as a matter of law. Accordingly, it is hereby

ORDERED that defendant's motion for summary judgment is granted; and it is further

ORDERED that plaintiff's cross-motion for summary judgment is denied; and it is further

ORDERED that this action be, and hereby is, dismissed.